[No. B186687. Second Dist., Div. Four. Oct. 24, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES WILLIAM GRANDY, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Under California Rules of Court, rules 976(b) and 976.1, only the Procedural Background, Facts, introductory paragraph of part D. of the Discussion, part D.1. of the Discussion, and Disposition are certified for publication.

## Counsel

Maureen L. Fox, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Joseph P. Lee and Erika D. Jackson, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

MANELLA, J.—

## PROCEDURAL BACKGROUND

On March 2, 2005, an information was filed charging appellant Charles William Grandy in count 1 with carjacking (Pen. Code,[1] § 215, subd. (a)); in count 2, with second degree robbery (§ 211); in counts 3 and 4, with assault on a peace officer with a semiautomatic firearm (§ 245, subd. (d)(2)); and in count 5, with possession of a firearm as a felon (§ 12021, subd. (a)(1)). It alleged under counts 1 through 4 that appellant had personally used a firearm (§§ 12022.5, subds. (a), (d), 12022.53, subd. (b)); in addition, under count 4, it alleged that appellant had personally discharged a firearm (§ 12022.53, subd. (c)). Finally, it alleged that appellant had three prior convictions within the scope of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)), three prior convictions for a serious felony (§ 667, subd. (a)(1)), and seven prior convictions (§ 667.5, subd. (b)). Appellant pled not guilty and denied the special allegations.

Trial was by jury. On September 23, 2005, the jury found appellant guilty as charged, and found the gun-related allegations to be true.[2] Following a bench trial, the trial court determined that appellant had suffered two prior convictions for serious felonies under the Three Strikes law and section 667, subdivision (a)(1). On October 3, 2005, it sentenced appellant to imprisonment for a total of 184 years to life.[3] This appeal followed.

---

[1] All further statutory citations are to the Penal Code, unless otherwise indicated.

[2] The information, as filed, alleged under counts 1 and 2 that appellant's victims were David Willoughby and Nicholas Dale. Before the jury returned its verdict, the trial court amended the information by striking the allegations regarding Dale.

[3] Under count 1, the trial court imposed a term of 25 years to life under the Three Strikes law, plus 10 years for the use of a gun (§ 12022.53, subd. (b)) and five years for each of appellant's two prior convictions (§ 667, subd. (a)); under count 2, it imposed and stayed a term of 25 years to life under the Three Strikes law, plus 10 years for the use of a gun (§ 12022.53, subd. (b)) and five years for each of appellant's two prior convictions (§ 667, subd. (a)); under count 3, it imposed a consecutive sentence of 27 years to life under the Three Strikes law, plus 10 years for the use of a gun and five years for each of appellant's two prior convictions (§ 667, subd. (a)); under count 4, it imposed a consecutive sentence of 37 years to life under the Three Strikes law, plus 20 years for the discharge of a gun (§ 12022.5, subd. (c)) and five years for each of appellant's two prior convictions (§ 667, subd. (a)); and under count 5, it imposed a consecutive sentence of 25 years to life under the Three Strikes law.

## FACTS

A. *Prosecution Evidence*

Approximately 12:30 a.m. on December 29, 2004, David Willoughby drove his Cadillac to a Ralph's store in the Ladera Center near La Cienega and La Tijera. He intended to buy flu medication for Nicholas Dale, who was a passenger in the car. When Willoughby entered the Ralph's lot, he parked behind a red Oldsmobile with several occupants. Willoughby saw appellant standing near its driver's door, which was partially open.

Shortly after Willoughby parked, appellant smashed the driver's side window of Willoughby's Cadillac and pointed a gun at his face. Willoughby recognized it to be a semiautomatic weapon, and saw that its ejection portal—from which empty cartridges are expelled—was closed. Appellant demanded Willoughby's car and money. Willoughby gave appellant his cash, and he and Dale left the car. Appellant, driving Willoughby's Cadillac, then followed the Oldsmobile out of the parking lot. Willoughby heard no gunshots as appellant drove away in his car. He told the Ralph's store manager about the crime and phoned 911.

Shortly after 12:40 a.m. on December 29, 2004, Los Angeles County Deputy Sheriff Otha McKinney was driving a patrol car when he and his partner heard a radio call about an active burglary alarm at the Ladera Center. As he entered the Ralph's parking lot, he saw a yellow Cadillac and a red car speeding toward him. McKinney made a call about the Cadillac to a nearby patrol car assigned to Los Angeles County Deputy Sheriffs Reynaldo McLaughlin and Timothy Brothers, who were attending to damaged power lines on La Cienega.

Brothers testified as follows: Approximately 12:30 a.m. on December 29, 2004, he and McLaughlin had diverted traffic away from a fallen light pole on La Cienega, and were directing traffic toward an off-ramp on Slauson. It was raining heavily, and Brothers wore bright yellow rain gear. After Brothers heard McKinney's call about the yellow Cadillac, he saw it approaching with its lights out. Brothers tried to stop the Cadillac, but it continued up the off-ramp weaving through traffic. Brothers and McLaughlin learned by radio that the Cadillac had been stolen, and they ran up the off-ramp, where it had halted at a red light.

While McLaughlin approached the driver's door, Brothers took a position for cover on the Cadillac's opposite side, about 10 to 15 feet away from appellant. Brothers stood behind a Mustang stopped in the lane next to that occupied by the Cadillac, about half a car length behind the Cadillac. From that position, Brothers could see appellant through the Cadillac's rear window.

When the deputy sheriffs told appellant to show his hands, he raised a gun and pointed it over his shoulder at McLaughlin, who was then on the driver's side of the Cadillac, near its trunk. Appellant ignored Brothers's orders to drop the gun, and he moved the gun when McLaughlin withdrew toward the Mustang. McLaughlin crossed the rear of the Cadillac and the front of the Mustang, and made his way up the Mustang's passenger side to its trunk, where he joined Brothers. Brothers did not see a muzzle flash from appellant's gun or hear it fire.

When McLaughlin was "clear," Brothers fired his weapon at appellant, who ducked down within the Cadillac. Brothers emptied his weapon, which contained 16 bullets. He and McLaughlin then evacuated the occupants of the grey Mustang, and took cover. When patrol cars arrived, appellant popped up, raised his hands, and got out of the Cadillac, where he was arrested.

McLaughlin testified as follows: After appellant drove past him and up the off-ramp, he learned that the Cadillac had been involved in a carjacking. He and Brothers pursued it on foot, and he approached the driver's side of the Cadillac. McLaughlin stated: "After I yelled my commands, [appellant] came up with his right hand with a handgun and pointed it towards my direction or coming towards my direction." McLaughlin then withdrew behind the Cadillac and along the passenger side of the Mustang to avoid being caught in front of Brothers during a crossfire. As he moved, he lost sight of appellant but heard several gunshots. He could not tell whether Brothers fired all of the shots. After he and Brothers evacuated the Mustang's occupants, appellant got out of the Cadillac, and the deputy sheriffs arrested him.

Jillian Barba testified that she drove her Mustang—which also contained Monique Asher—up the Slauson off-ramp on the night in question. She saw an officer run up the driver's side of her car and another officer move on the passenger's side. They were focused on a car in front of her. After they yelled something, she heard gunshots. She and Monique then left the Mustang.

Viroul Gatchalian testified that at 12:40 a.m. on December 29, 2004, he stopped on the Slauson off-ramp and saw two deputy sheriffs approach the Cadillac in front of him. One of them went on the driver's side of the Cadillac and the other stayed on its passenger's side. The deputy sheriffs told the Cadillac's driver to come out, but the driver instead pointed what appeared to be a gun across his left shoulder. One of the deputy sheriffs ran in front of Gatchalian's car, and both ended up behind an adjacent Mustang. Gatchalian heard gunshots, and he backed up his car approximately 20 to 30 feet. He did not know the source of the gunshots. The driver leaned over in the Cadillac for a couple of minutes, and then got out of the car.

Investigating officers found a gun, cash, and bloodstains inside the Cadillac. Appellant's DNA matched to a very high probability DNA extracted from blood on the gun in the Cadillac.

Tracy Peck, a firearms examiner, testified that she discovered a semiautomatic pistol in the Cadillac when she examined it on December 29, 2004. The gun's safety was off, and it contained four live rounds. A ruptured cartridge case was stuck in the gun's ejection port, and a bullet was lodged in its barrel. Peck opined that the gun malfunctioned when the cartridge case entered its firing chamber, causing an explosion that tore open the case but failed to push the bullet out of the gun. After Peck removed the ruptured case and bullet, she found that the gun fired properly.

Peck also examined the Cadillac. Its driver's side window and rear window were broken, and it had 14 bullet holes, all caused by bullets fired from a position outside and behind the Cadillac. Aside from appellant's gun, she found no evidence that bullets had been fired from inside the Cadillac.

A red Oldsmobile had stopped on the off-ramp during the shooting, and investigating officers detained its occupants. Willoughby, who was taken to the Slauson off-ramp, identified the red Oldsmobile there as the one he had seen earlier, but he did not recognize its occupants. The occupants were interviewed and released.

B. *Defense Evidence*

Reginald Lester, a Los Angeles County firefighter and paramedic, testified that he rendered medical care to appellant shortly after his arrest on December 29, 2004. According to Lester, appellant displayed gunshot wounds to his head and right thumb, and he was transported to a hospital emergency room.

Los Angeles County Deputy Sheriff Carlos Lopez testified that on December 29, 2004, he saw a red Oldsmobile parked near the Slauson off-ramp while he was investigating the shooting. Los Angeles County Deputy Sheriff Tim Stanley testified that he took Willoughby to the Slauson off-ramp for a field showup on the date in question. There, Willoughby viewed a red Oldsmobile, but was unable to identify its occupants. Steven Tillman, a Los Angeles County fingerprint examiner, testified that appellant's fingerprints did not match any of the prints found in Willoughby's Cadillac.

Tony Williams testified that after midnight on December 29, 2004, he was driving a red Cutlass also containing Andre Simmons and Courtney Duty. He saw two police officers run up a ramp, and then some officers arrested him and his passengers. Williams and his passengers were shown to someone, and

then taken to another location and placed in jail cells. Williams denied that he knew appellant or that he had driven near the Ladera Center.

Courtney Duty testified that he was in Williams's car when police officers detained Williams, Simmons, and Duty while the car was stopped in traffic. They were arrested, directed to appear before a witness, and then transported to a location where they were held in cells. They were released the next morning. Duty also denied knowing appellant or that he had been to the Ladera Center.

DISCUSSION*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

A.–C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### D. *Motion for Judgment of Acquittal*

Appellant contends that the trial court improperly denied his motion for judgment of acquittal (§ 1181.1) regarding count 3, which charged appellant with assault on Deputy Sheriff Brothers, and the accompanying allegation that appellant had discharged a firearm.[4] The trial court is obliged to deny a motion for acquittal "when there is any substantial evidence, including all reasonable inferences to be drawn from the evidence, of the existence of each element of the offense charged." (*People v. Mendoza* (2000) 24 Cal.4th 130, 175 [99 Cal.Rptr.2d 485, 6 P.3d 150].) We review this denial in light of the evidence before the trial court when it ruled. (*People v. Smith* (1998) 64 Cal.App.4th 1458, 1464 [76 Cal.Rptr.2d 75].) Here, appellant sought a judgment of acquittal at the close of the prosecution's case-in-chief, which we examine for substantial evidence to support the trial court's ruling.

### 1. *Gun Discharge Allegation*

Appellant contends that the prosecutor presented insufficient evidence that he discharged a handgun within the meaning of section 12022.53,

---

*See footnote, *ante*, page 33.

[4] Section 1118.1 provides that upon the defendant's motion at the close of evidence on either side, the trial court "shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."

subdivision (c) (subdivision (c)), which mandates an additional and consecutive term of imprisonment of 20 years for "any person who . . . personally and intentionally discharges a firearm" in the commission of enumerated offenses, including assault on a peace officer. He argues that the prosecution's case-in chief showed—at most—that he tried to shoot his gun, which misfired and never emitted a bullet, and that therefore there is no evidence that he *discharged* his gun. As explained below, we agree with the premise of this argument but reject its conclusion.

During the prosecution's case-in-chief, Willoughby testified that appellant's gun looked operable during the carjacking, and its ejection portal was closed. He did not hear a gunshot as appellant drove away. Deputies Brothers and McLaughlin testified that appellant aimed, or tried to aim, his gun at them during their confrontation with him. Firearms expert Peck testified that she found a torn cartridge case in the gun's ejection port and a bullet in its barrel. She opined that the gun's firing pin struck an improperly supported cartridge in the firing chamber, causing an explosion that ruptured the cartridge case but failed to propel the bullet completely out of the barrel. According to Peck, this explosion made a noise, but she did not know whether there also had been muzzle flash from the gun. Setting aside appellant's gun, Peck found no evidence that a bullet had been fired from inside Willoughby's Cadillac. In our view, this evidence supports the reasonable inference that appellant pulled his gun's trigger at least once during the confrontation with Brothers and McLaughlin, but not that his gun ever emitted a bullet. Respondent apparently agrees on this matter, but argues that appellant "discharged" the gun within the meaning of subdivision (c) when he pulled the trigger and caused the explosion in the gun's firing chamber, notwithstanding the gun's failure to project a bullet.

 We therefore confront a question of statutory interpretation, viz., the interpretation of the phrase to "personally and intentionally discharge[] a firearm" within the meaning of subdivision (c). " 'In construing a statute, our task is to determine the Legislature's intent and purpose for the enactment. [Citation.] We look first to the plain meaning of the statutory language, giving the words their usual and ordinary meaning. [Citation.] If there is no ambiguity in the statutory language, its plain meaning controls; we presume the Legislature meant what it said. [Citation.] "However, if the statutory language permits more than one reasonable interpretation, courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." [Citations.]' [Citations.] We examine the statutory language in the context in which it appears, and adopt the construction that best harmonizes the statute internally and with related statutes. [Citations.]" (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1149 [35 Cal.Rptr.3d 373] (*Palmer*).)

Section 12022.53 is part of the so-called 10-20-life law enacted in 1997 to enhance penalties for firearm use in the commission of certain felonies (Stats. 1997, ch. 503, enacting Assem. Bill No. 4 (1997–1998 Reg. Sess.). (*People v. Garcia* (2002) 28 Cal.4th 1166, 1171 [124 Cal.Rptr.2d 464, 52 P.3d 648]; *Palmer, supra*, 133 Cal.App.4th at p. 1149.) As our Supreme Court explained in *People v. Garcia, supra*, 28 Cal.4th at page 1172, "[t]he legislative intent behind section 12022.53 is clear: 'The Legislature finds and declares that substantially longer prison sentences must be imposed on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime.' " (Quoting Stats. 1997, ch. 503, § 1.)

■ Section 12022.53 provides "for increasingly serious circumstances of firearm use. Under subdivision (b), if the defendant 'personally used a firearm' . . . , the mandatory additional consecutive punishment is 10 years. Under subdivision (c), if the defendant 'intentionally and personally discharged a firearm,' the mandatory additional consecutive punishment is 20 years. Under subdivision (d), . . . if the defendant 'intentionally and personally discharged a firearm and proximately caused great bodily injury, as defined in Section 12022.7, or death, to any person other than an accomplice,' the mandatory additional consecutive punishment is 25 years to life." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 493 [90 Cal.Rptr.2d 517].) Section 12022.53 thus recognizes different degrees of culpability, and imposes "three gradations of punishment based on increasingly serious types and consequences of firearm use in the commission of the designated felonies." (*People v. Martinez, supra*, 76 Cal.App.4th at p. 495.)

It is well established that the phrase "uses a firearm," as found in subdivision (b) of section 12022.53 (subdivision (b)), encompasses the display of an unloaded or inoperable firearm.[5] (*People v. Martinez, supra*, 76 Cal.App.4th at p. 495.) Under this understanding of the term "uses," a defendant uses a firearm by intentionally displaying it in a menacing manner, firing it, or striking or hitting a human being with it. (*People v. Johnson* (1995) 38 Cal.App.4th 1315, 1319–1321 [45 Cal.Rptr.2d 602].) However, no court has confronted the issue before us, namely, whether a defendant who aims a gun, pulls its trigger, and thereby causes an explosion in its firing chamber, has discharged the gun within the meaning of subdivision (c). This issue concerns the boundary between the *mere* use of a firearm under subdivision (b) and the discharge of a firearm under subdivision (c).

■ We begin by examining the language of subdivision (c). As ordinarily understood, the verb "to discharge" carries several meanings relevant here. It

---

[5] The term "firearm," as used here, is defined by statute to mean "any device, designed to be used as a weapon, from which is expelled through a barrel a projectile by the force or any explosion or other form of combustion." (§ 12001, subd. (b).)

means generally "to relieve of a charge, load, or burden," "to give outlet or vent to," or "to emit"; when applied to a gun, it may mean variously "to go off," "to fire"; or "to project the missile of." (Webster's 3d New Internat. Dict. (2002) p. 644.) In view of these definitions, the phrase "discharge a firearm" can connote the projection of a bullet, but it is not restricted to this meaning. The phrase, as commonly understood, is also appropriately applied to the shooting of a firearm that does not emit a bullet because, for example, it is loaded with blanks. (E.g., *Schmitt v. City of Rialto* (1985) 164 Cal.App.3d 494, 498, 500–504 [210 Cal.Rptr. 788] [city properly terminated police officer who "discharged [his] weapon" by firing his firearm loaded with blanks at another officer].)

Here, appellant's gun "gave outlet or vent to" the explosion within its firing chamber (Webster's 3d New Internat. Dict., *supra*, at p. 644), but it did not project a bullet. Because the language of subdivision (c), taken in isolation, does not resolve whether this constitutes a discharge under section 12022.53, our inquiry shifts to the surrounding provisions and their underlying purpose, with attention to " ' "the evils to be remedied." ' " (*Palmer*, *supra*, 133 Cal.App.4th at p. 1149.)

We find guidance on the issue before us in *Palmer*, which resolved related issues concerning the phrase "discharges a firearm," as it appears in subdivision (d) of section 12022.53 (subdivision (d)). In *Palmer*, the defendant, who had robbed a store, was backing his car out of a parking space near the store when he saw a police officer exiting a patrol car in the store's parking lot. (*Palmer*, *supra*, 133 Cal.App.4th at pp. 1146–1147.) The defendant stopped his car, swiveled out of his seat, and fired a gun at the officer, who dove behind the patrol car's door and broke his ankle. (*Id.* at p. 1147.) No bullet from the defendant's gun hit the officer. (*Id.* at p. 1147.) A jury convicted the defendant of assault on a peace officer and found true an allegation under subdivision (d) that he had discharged a firearm in the commission of this offense, thereby causing great bodily injury. (*Palmer*, at p. 1148.)

On appeal, the defendant challenged this finding, contending that the officer injured himself in response to the defendant's act of pointing the gun, rather than his act of discharging the gun. (*Palmer*, *supra*, 133 Cal.App.4th at p. 1148.) At trial, the officer had testified that when the defendant swiveled and pointed the gun, the officer dove for cover and saw "the flash of the gun as he ducked behind the patrol vehicle's door." (*Id.* at p. 1154.) The defendant thus argued that the officer sought cover *before* the defendant pulled the trigger, and the officer's injuries resulted from the act of pointing the gun, not from the act of discharging it. (*Id.* at pp. 1153–1155.) In addition, the defendant contended that the jury's finding was incorrect because the bullets the gun discharged played no role in causing the officer's injuries.

Following an examination of case authority, the court in *Palmer* rejected these contentions. (*Palmer, supra*, 133 Cal.App.4th at pp. 1148–1153.) Noting that the Legislature's purpose in enacting section 12022.53 was "to protect citizens from injury and deter violent crime," the court concluded that subdivision (d) imposes additional punishment for injuries proximately caused by the discharging of a gun, *regardless* of whether a bullet caused the injuries. (*Palmer*, at p. 1152.) It reasoned that had the Legislature intended to limit subdivision (d) to bullet-related injuries, it could have said so in direct terms, and without reference to proximate causation. (*Palmer*, at pp. 1152–1153.)

The court also reasoned that any such limitation would not comport with the legislative purpose of section 12022.53: "It is surely to be expected that persons attempting to dodge a bullet may react in panic with evasive maneuvers that are likely to cause injury to themselves or others. There appears to be no principled reason to distinguish the type of injury here— suffered when the victim took life-saving evasive action—from a direct hit by the bullet. Both are equally caused by the discharge of the firearm. In both instances, the defendant's culpability is the same. A defendant should not benefit simply because he or she is a bad shot, or because the victim is fortuitously able to move out of harm's way." (*Palmer, supra*, 133 Cal.App.4th at p. 1152.) The court also concluded that substantial evidence supported the finding that the officer's injuries resulted from a discharge of the gun. It reasoned: "[The defendant's] argument rests upon the premise that the 'discharge' of a firearm refers only to the instant the firearm's trigger is actually pulled. [This] interpretation of the statute is unduly crabbed. We see nothing in the statutory language that so limits the meaning of 'discharge' as applied to the facts of this case, nor does [the defendant] cite any authority so limiting the term. The evidence recited above showed [the defendant] exited his vehicle and immediately turned, pointed the gun, and fired, all in one essentially seamless motion. The most reasonable interpretation of this evidence was that [the defendant]'s conduct of pulling out and pointing the gun, and pulling the trigger, all constituted a single act of 'discharging' the gun for purposes of the statute." (133 Cal.App.4th at p. 1154.)

■ In view of *Palmer*, we conclude that appellant's conduct also constituted a discharge within the meaning of subdivision (c), even though his gun misfired and did not emit a bullet. Because subdivisions (c) and (d) are closely related elements of a single statutory scheme, the phrase "discharges a firearm" must be viewed as carrying the same meaning in each provision. The key difference between these provisions is that subdivision (d) addresses "discharges" that *actually* cause injury, and thus imposes greater punishment on discharges than subdivision (c).

Although the defendant's gun in *Palmer* did not misfire, the rationale in *Palmer* authorizes punishment under subdivision (d) when a defendant causes

injury by raising a gun and pulling the trigger, even though the gun does not emit a bullet. As the *Palmer* court explained, given the legislative purpose underlying section 12022.53, no principled distinction can be drawn within subdivision (d) between bullet-related injuries and injuries caused by the victim's evasive action in response to the defendant's gun-related conduct.

For similar reasons, no principled distinction can be drawn within subdivision (d) between evasion-based injuries caused by a defendant who aims a gun, pulls its trigger, and projects a bullet, and evasion-based injuries caused by a defendant who engages in identical conduct, but whose gun noisily misfires and fails to emit a bullet. Each defendant will prompt precisely the same response in victims, who cannot see whether the gun has actually expelled a bullet. The defendants are thus equally culpable, and should be treated alike. Accordingly, limiting "discharges" under subdivision (d) to instances in which a gun emits a bullet would arbitrarily frustrate the legislative purpose underlying section 12022.53.

Given the close link between subdivisions (c) and (d), we conclude that a defendant who aims a gun and pulls its trigger, thereby causing an explosion in its firing chamber, has discharged the gun within the meaning of subdivision (c).[6] Because the prosecution's case-in-chief supports a determination that this is what occurred, the trial court did not err in denying a judgment of acquittal with respect to the special allegation.

### 2. *Assault On Officer Brothers**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### E., F.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[6] Appellant contends that these facts constitute only an *attempt* to discharge a gun, which falls outside the scope of subdivision (c). He points to subdivision (d) of section 626.9, which renders it unlawful in some circumstances "to discharge, or to attempt to discharge, a firearm in a school zone," and argues that this provision manifests the Legislature's intent to distinguish between the discharge of a gun and an attempt to discharge a gun. However, this provision does not disturb our conclusions. Section 626.9 is not part of 10-20-life law enacted in 1997 (see § 626.9, subd. (a)), and thus it provides limited guidance regarding the Legislature's intent in enacting subdivision (c) of section 12022.53. Furthermore, nothing in section 626.9 or the case authority interpreting it establishes that the factual situation at issue here would constitute *merely* an attempt to discharge a gun under section 626.9, subdivision (c).

*See footnote, *ante*, page 33.

## DISPOSITION

For the reasons explained in this opinion (see pt. F.1., *ante* [nonpub.]), the judgment is reversed with respect to appellant's sentence, and the matter is remanded to the trial court for further proceedings in accordance with this opinion. In all other respects, the judgment is affirmed.

Willhite, Acting P. J., and Suzukawa, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 7, 2007, S148187. Kennard, J., was of the opinion that the petition should be granted.