Filed 1/31/14  P. v. Paz CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F064457 |
| Plaintiff and Respondent, | |
| v. | (Merced Super. Ct. No. CRM012907) |
| JOSE MADRIGAL PAZ, | |
| Defendant and Appellant. | **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  John D. Kirihara, Judge.

Barbara Michel, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, William K. Kim and Tiffany J. Gates, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Appellant/defendant Jose Madrigal Paz shot and seriously wounded his employer, Edward Trindade, when Trindade fired him for being drunk on the job.  Defendant fired

three shots into Trindade's chest and back, and took away Trindade's cell phone to prevent him from calling for help. When Trindade pleaded that he was going to die, defendant suddenly decided to help the gravely wounded man and drove him to the hospital. Trindade survived his wounds.

After a jury trial, defendant was convicted as charged of count I, attempted murder (Pen. Code,[1] §§ 664/187), with the special allegation that he personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)); count II, assault with a firearm (§ 245, subd. (a)(2)), with the special allegations that he personally used a firearm (§ 12022.5, subd. (a)), and personally inflicted great bodily injury (§ 12022.7, subd. (a)); and count III, possession of a firearm by a felon (§ 12021, subd. (a)(1)).

Defendant was sentenced to the midterm of seven years for count I, attempted murder, plus a consecutive term of 25 years to life for the section 12022.53, subdivision (d) firearm allegation. The court stayed the terms imposed for the remaining counts and special allegations pursuant to section 654.

On appeal, defendant contends the court committed prejudicial error when it denied his request to instruct the jury on personal use of a firearm pursuant to section 12022.5, as a "lesser included enhancement" to special allegation charged as to count I, attempted murder, that he personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)). We affirm.

## FACTS

Edward Trindade owned and operated a farm in Merced County. In 1989, he hired defendant to work as a tractor driver. They became friends and their families socialized together. However, Trindade testified defendant had a drinking problem. Defendant was often drunk when he operated the tractor, and caused a mess in the field. Trindade usually sent him home to sober up.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

2.

One morning in 2004, defendant arrived at the farm when he was drunk. He held a rifle out of his vehicle and asked Trindade if he was going to be fired. Trindade said he would be fired if he came to work while drunk, but he would always have a job if he quit drinking. Defendant went home that day, "sobered up," and kept his job. Trindade testified defendant continued to work for him, but defendant kept drinking despite Trindade's lectures and warnings.

At some point in 2008, Trindade fired defendant because of his drinking. On or about February 20, 2008, defendant arrived at the farm and confronted Trindade's adult son, Aaron, and Justin Booth, another farm employee. Trindade was not there. Defendant was drunk and said he was looking for Trindade. Defendant waved around a gun and said he wanted to kill Trindade. He pointed the gun at Aaron and Booth, and said he was going to kill them. Aaron and Booth thought he was acting like a lunatic. They called the sheriff's department, and defendant was arrested and taken to jail.

Defendant was later charged with a criminal offense based on the 2008 incident.[2] Trindade and Aaron went to the hearing to support defendant and his family. Trindade spoke on defendant's behalf and said he was a good man. He urged the court to release defendant from jail and place him on probation. Trindade said the court should order defendant into a treatment program, and prohibit him from owning a firearm, so defendant would " 'become a good man and learn his lesson.' "[3] The court agreed to place defendant in a treatment program. Defendant completed the program, and Trindade gave him another chance and hired him back. Trindade described defendant as a good guy when he was sober.

---

[2] The parties stipulated that defendant was convicted of a felony in 2008.

[3] Neither Trindade nor anyone in his family spoke on defendant's behalf after he was convicted of attempting to murder him in this case.

Trindade testified defendant stayed sober for about one year. However, he started drinking heavily again and his work deteriorated. Trindade testified defendant was "pretty out of his mind" and acted "crazy" when he was drunk. Defendant kept working, and Trindade tried to convince him to stop drinking.

**The shooting**

On or about September 20, 2010, Trindade learned defendant damaged one of the farm's pickup trucks when he was drunk. While backing up the tractor, defendant damaged the truck.

At 9:00 a.m. on September 21, 2010, defendant was operating the tractor in the field. Trindade called defendant's cell phone and complained about the damaged truck. Trindade could tell that defendant was drunk. Defendant told Trindade to drive out to the field to meet him.

Trindade drove his truck to defendant's location in the field. Defendant stopped the tractor and jumped off. Trindade testified it was obvious defendant was "completely out of his mind drunk[,]" and the smell of alcohol hit him in the face. Defendant's eyes were bulging out and he had a weird look on his face. Trindade climbed onto the tractor and shut off the engine. Trindade told defendant: " 'Jose, no more chances[,]' " and fired him.

As Trindade stepped off the tractor, defendant shot him once in the back with a nine-millimeter handgun. Trindade fell down, then got up and faced defendant. Defendant said: " 'Oh, you want some more?' " Defendant fired two more shots into the front of Trindade's chest. Trindade fell to the ground.

Trindade was lying in the dirt and bleeding profusely. He reached for his cell phone and tried to call 911. Defendant took the cell phone away from him. Trindade told defendant, " 'Jose, I'm going to die ….' " Defendant said no, that he was not going to die. Trindade testified defendant seemed to come to his senses. Defendant picked up Trindade and carried him to Trindade's truck. Trindade believed defendant put the gun

4.

in his belt. After he placed Trindade inside the truck, defendant went back to the tractor and retrieved a 12-pack of beer. Defendant put the beer under the driver's seat of the truck, and he drove out of the field and headed to the hospital in Merced.

Defendant drove Trindade to the hospital, which was 5 to 10 miles from the shooting scene. Trindade described it as a "[t]errible" drive because defendant drove very fast, jumped curbs, and blew two tires. Trindade was bleeding from his chest and in a great deal of pain. Defendant mistakenly drove to the old hospital complex, and then realized he was in the wrong place. Defendant proceeded driving to the new hospital facility. When they arrived, defendant got out of the truck, and some of the beer bottles fell out of the driver's door. Trindade heard defendant call out for help.

There were several construction workers outside the hospital when defendant drove up. Defendant nearly hit their work truck when he arrived. Defendant shouted that someone needed help, and then he walked away. The workers found Trindade in the vehicle and alerted the emergency room. Some of the workers followed defendant as he walked around the hospital building. They found defendant in the bushes. They surrounded him and persuaded him to return to the hospital so he could talk to the police. Defendant agreed and walked back to the truck.

Trindade was still conscious when he arrived in the emergency room, but he was in shock from massive internal bleeding. The emergency room physicians believed he was not going to live, and allowed an officer to briefly speak with him and ask what happened. Trindade said defendant shot him.

Trindade suffered major internal injuries from three bullet wounds into his chest and back. The bullets entered his body very close to his heart and spine, and severely damaged his colon. He was on life support and received 17 pints of blood. He was in the hospital for 18 days and needed multiple operations.

## Defendant's statements

Defendant was detained at the hospital by deputies from the Merced County Sheriff's Department. A deputy advised him of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436, and defendant agreed to answer questions. Defendant's eyes were red and his speech was slurred. Defendant consented to a breathalyzer test, and his blood-alcohol content was 0.20 percent, which was two and one-half times the legal limit. Defendant claimed he only had one beer.

When asked about Trindade's wounds, defendant claimed a former farm employee had arrived in a red truck, argued with Trindade, and shot him. Defendant said he rushed to help Trindade and drove him to the hospital. About two hours later, defendant was again questioned and said he had consumed four beers that day, but again insisted Trindade was shot by a former employee. The deputies asked defendant if he had ever threatened Trindade. Defendant said no, but admitted he once threatened Trindade's son.

Defendant eventually admitted he shot Trindade, but claimed the shooting happened because Trindade climbed on the tractor and grabbed him. Defendant became very emotional, and said he loved his friend and did not want to do it.

The deputies asked defendant what happened to the gun. Defendant thought he left it in the field, and agreed to show them. The deputies drove defendant to the shooting scene and found the tractor in the field. Defendant walked around the area and then said he threw away the gun. The deputies could not find the weapon, and defendant eventually admitted he left it at the hospital. They went back to the hospital, and defendant showed them where he buried the gun in a landscaped area. A deputy testified the gun was so well hidden they would not have found it without defendant's assistance.

The deputies recovered a nine-millimeter semiautomatic handgun. There was one live cartridge in the chamber, and an unexpended cartridge in the magazine. One expended bullet was recovered from Trindade's body. A spent casing was in defendant's pocket, and two spent casings were found at the shooting scene in the field.

## DEFENSE EVIDENCE

Defendant did not testify.

Dr. Phillip Hamm, Jr., a licensed psychologist, testified defendant had a mood disorder. Such people are paranoid, easily agitated, have problems managing their anger, and have seriously impaired judgment. In addition, such people often have substance abuse problems because they self-medicate with drugs and alcohol. Dr. Hamm testified alcohol was a poor substitute for the correct medication, and exacerbated the symptoms of a mood disorder. A person with a mood disorder is already predisposed to act impulsively, and alcohol further lowers that person's inhibitions and impairs their judgment.

Dr. Hamm further testified to his opinion that defendant was an alcoholic. Defendant told Dr. Hamm that he started drinking when he was 14 years old, and he drank on a daily basis for 15 years. Defendant estimated he had experienced 15 to 20 alcoholic blackouts. Defendant's father was also an alcoholic. Defendant suffered from Type 2 diabetes, and alcohol could make such a person sedated and lethargic.

Dr. Hamm testified defendant was extremely intoxicated at the time of the shooting. He was also taking several medications for depression. The combination of alcohol, medication, and his mood disorder magnified his disorientation, poor judgment, and paranoia, and he was not able to discern what was actually happening. Defendant told Dr. Hamm he did not recall shooting Trindade, but he remembered hearing gunshots and felt he was "up in the clouds." Defendant said his attention became focused when Trindade said he was going to die, which allowed defendant to take some action to help him.

7.

## DISCUSSION

## THE JURY WAS PROPERLY INSTRUCTED
## ON THE FIREARM ALLEGATION

In count I, defendant was charged with attempted murder, with the special allegation that he personally and intentionally discharged a firearm causing great bodily injury, pursuant to section 12022.53, subdivision (d).  On appeal, he contends the court should have granted his request to instruct the jury with the "lesser included" special allegation of "simple use of a firearm," pursuant to section 12022.5.

### A.  Background

During the instructional phase, the jury was instructed that attempted voluntary manslaughter was a lesser included offense of count I, attempted murder.  The jury was further instructed that it could only consider defendant's voluntary intoxication to determine if he acted with the intent to kill as to count I, attempted murder; the lesser included offense of attempted voluntary manslaughter; and the special allegation that he personally and intentionally discharged a firearm causing great bodily injury.

During the lunch break in the midst of instructing the jury, defense counsel asked the court to instruct the jury with "personal use of a firearm" as a "lesser included" for the special allegation that he personally and intentionally discharged a firearm causing great bodily injury.  Defense counsel argued the jury could determine that defendant may have intended to murder Trindade, and "did fire the weapon[], but [he] did not intentionally fire the weapon.  And I'm not sure how they would get there, but they could believe that, that he attempted to murder, but that he did not intentionally discharge the firearm.  It seems like it is a lesser included enhancement."

The prosecutor replied they had been going "back and forth" on the issue, but argued it was "almost an impossibility" for the jury to find defendant had the intent to kill for attempted murder, and that the gun was accidentally or unintentionally discharged.

8.

The prosecutor believed an alternate firearm instruction would open up "a whole can of worms" and create "a mess…."

The court replied that it would address the matter if possible, and took it under submission to research the issue. The trial continued as the prosecutor and defense counsel gave their closing arguments.

After the parties completed their arguments, the court denied defendant's instructional request for a "lesser included" firearm enhancement, and held it did not have a sua sponte duty to instruct on a lesser included "enhancement."

### B.  Lesser included instructions

The trial court is required to instruct on its own motion on all lesser necessarily included offenses that are supported by the evidence. (*People v. Breverman* (1998) 19 Cal.4th 142, 148-149.) However, a court does not have a sua sponte duty to instruct a jury on lesser included enhancements. (*People v. Majors* (1998) 18 Cal.4th 385, 410-411.)

The superior court correctly concluded it did not have a sua sponte duty to instruct the jury on "lesser included enhancements." However, defendant argues this issue does not involve sua sponte instructions since he expressly requested the court to instruct the jury with a "lesser included" firearm allegation. Defendant argues the court should have granted his request for a lesser included instruction on the "simple use of a firearm" pursuant to section 12022.5, based on the evidence about defendant's intoxication, his frantic efforts to save Trindade's life, and that he "did not intend to murder his long-time friend."

Even assuming the court should have given the defense instruction on request, we find the alleged error is harmless under any standard. The failure to instruct on a lesser included offense is not prejudicial if the factual question posed by the omitted instruction was necessarily resolved by the jury on other properly given instructions, or if an examination of the entire record establishes no reasonable probability that the error

9.

affected the outcome of the case. (*People v. Sakarias* (2000) 22 Cal.4th 596, 620-621; *People v. Blair* (2005) 36 Cal.4th 686, 747.) We will presume the same standard would apply for the court's refusal to instruct on a lesser included firearm allegation.

### C. <u>Firearm allegations</u>

We find that to the extent the court should have given a personal use instruction, the failure to do so was not prejudicial based on the entirety of the instructions and the jury's verdict. As to count I, attempted murder, it was alleged defendant personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (d), which states in relevant part:

> "Notwithstanding any other provision of law, any person who, in the commission of a [specified felony] …, *personally and intentionally discharges a firearm and proximately causes great bodily injury*, as defined in Section 12022.7, or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

For the purposes of this allegation, great bodily injury is defined as a significant or substantial injury. (§ 12022.7.) Great bodily injury need not meet any particular standard for severity or duration but need only be a substantial injury beyond that inherent in the offense itself. (*People v. Escobar* (1992) 3 Cal.4th 740, 746-747; see, e.g., *People v. Wolcott* (1983) 34 Cal.3d 92, 107 [gunshot wounds to a victim's leg constituted great bodily injury where the victim lost little blood, no sutures were used, and he returned to work the next day]; *People v. Le* (2006) 137 Cal.App.4th 54, 57-59 [victim endured great bodily injury when he was struck by a bullet while a passenger in a car, and suffered soft tissue and muscular injury to both legs but was released from the hospital within 24 hours]; *People v. Lopez* (1986) 176 Cal.App.3d 460, 465 [victims suffered great bodily injury when they immediately fell to the ground from penetrating gunshot wounds, and were disoriented, screamed, or felt fiery heat].)

Section 12022.5, subdivision (a), the purported lesser allegation[4], states in relevant part:

> "[A]ny person who *personally uses* a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense." (Italics added)

Defendant contends his request for a section 12022.5, subdivision (a) instruction was supported by the defense evidence that he did not intend to kill Trindade. "A firearm-use enhancement under section 12022.5, subdivision (a) requires an element of intent. [Citations.]" (*People v. Mehserle* (2012) 206 Cal.App.4th 1125, 1139.) The "use" prohibited by section 12022.5, subdivision (a) "means 'to display a firearm in a menacing manner, *to intentionally fire it*, or to intentionally strike or hit a human being with it.' [Citations.]" (*In re Tameka C.* (2000) 22 Cal.4th 190, 197, italics added.) "[T]he prosecution must prove that the defendant 'intentionally' used the firearm [citation], and that this use occurred 'in the commission of' the crime. An intentional use of a firearm in the commission of a crime does not encompass any specific intent." (*People v. Wardell* (2008) 162 Cal.App.4th 1484, 1494.) "No intent to 'do some further act or achieve some additional consequence' is part of the statutory definition." (*Ibid.*)

---

**4** The People dispute defendant's claim that section 12022.5, subdivision (a) would have been the lesser "personal use" allegation applicable to this case since defendant was charged with attempted murder. The People assert the only possible "lesser" enhancement would have been defined by section 12022.53, subdivision (b), since attempted murder is one of the felonies enumerated in section 12022.53, subdivision (a). Section 12022.53, subdivision (b) states: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), *personally uses a firearm*, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years…." (Italics added.) While there is an obvious disparity between the two statutes for the term of years, the same definitions for "personal use" would apply for both provisions. (See, e.g., *People v. Grandy* (2006) 144 Cal.App.4th 33, 42.)

11.

As applied to the instant case, it was undisputed that defendant personally fired one shot from a nine-millimeter handgun into Trindade's back. When Trindade struggled to his feet and faced defendant, defendant asked if he wanted some more and fired two shots directly into his chest. There was overwhelming evidence that Trindade suffered great bodily injury from the grievous wounds which nearly resulted in his death. The bullets entered his body very close to both his heart and spinal cord, he suffered massive bleeding before he reached the hospital, and the emergency room staff believed he was going to die.

Defendant argues the personal use allegation was supported by evidence that he did not have the specific intent to kill Trindade, and the shooting was accidental. However, that theory was placed before the jury based on the instructions on the elements of attempted murder (CALCRIM No. 600), voluntary intoxication (CALCRIM No. 625), and defense counsel's closing arguments that defendant did not intend to kill Trindade. Evidence of a defendant's voluntary intoxication is not an affirmative defense to a crime. (§ 29.4, subd. (a); *People v. Martin* (2000) 78 Cal.App.4th 1107, 1116-1117; 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Defenses, § 26, pp. 355-356.) Evidence of a defendant's voluntary intoxication is inadmissible to negate the existence of a general criminal intent for a charged offense. (*People v. Atkins* (2001) 25 Cal.4th 76, 81.) As to a specific intent crime, however, evidence of a defendant's voluntary intoxication may be admissible on the issue of whether the defendant actually formed the required specific intent to commit attempted murder. (§ 29.4, subd. (b); *People v. Castillo* (1997) 16 Cal.4th 1009, 1014-1015; *People v. Atkins, supra,* 25 Cal.4th at p. 81; *People v. Carr* (2000) 81 Cal.App.4th 837, 843; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1242-1243.)

12.

In this case, the jury was instructed that as to attempted murder, defendant had to intend to kill the victim, and he was guilty even if, "after taking a direct step toward killing, [he abandoned] further efforts to complete the crime."[5] As for voluntary intoxication, the jury was instructed that it could only consider that evidence to decide whether defendant "acted with an intent to kill" as to count I, attempted murder.

Despite these instructions, defendant was convicted of attempted murder and the jury rejected his defense theory that his voluntary intoxication negated his specific intent to kill. Given the jury's verdict on count I, it necessarily concluded that he personally and intentionally discharged the firearm, as required by section 12022.53, subdivision (d), when he fired the first shot into Trindade's back, asked Trindade if he wanted some more, and then fired two more shots into his chest. We thus conclude the question posed by defendant's requested instruction on personal use of a firearm was necessarily resolved by the jury adversely to defendant on other, properly given instructions, and there was no reasonable probability that the purported instructional error affected the outcome of the case.

---

[5] The latter phrase addressed defendant's sudden change in disposition, from firing additional shots into Trindade's body and taking away his cell phone, to placing him in the truck and driving him to the hospital.

13.

**DISPOSITION**

The judgment is affirmed.

_____
Poochigian, J.

WE CONCUR:


_____
Levy, Acting P.J.


_____
Kane, J.

14.