Filed 10/20/15  P. v. Mosley CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>LAVELLE MOSLEY et al.,<br><br>     Defendants and Appellants. | B255397<br><br>(Los Angeles County<br>Super. Ct. No. PA074598) |

APPEALS from judgments of the Superior Court of Los Angeles County. Daniel B. Feldstern, Judge.  Affirmed.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant Lavelle Mosley.

A. William Bartz, Jr., under appointment by the Court of Appeal, for Defendant and Appellant Terion Lamarr Collins.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Joseph P. Lee, William H. Shin, and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In a fourth amended information, codefendants and appellants Lavelle Mosley (Mosley) and Terion Lamarr Collins (Collins) (collectively appellants) were charged with five counts of second degree robbery. (Pen. Code, § 211; counts 1-4, 7.)[1] As to all counts, it was alleged that the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang pursuant to section 186.22, subdivision (b)(1)(C), that a principal personally used a firearm within the meaning of section 12022.53, subdivisions (b) and (e)(1), that Mosley served a prior prison term within the meaning of section 667.5, subdivision (b), and that Collins suffered a prior conviction of a serious or violent felony pursuant to sections 1170.12, subdivisions (a) through (d) and 667, subdivisions (b) through (i). As to counts 1 to 4, it was further alleged that Collins suffered a prior serious felony conviction pursuant to section 667, subdivision (a)(1).[2]

The jury found appellants guilty of counts 1 to 4, and guilty of the lesser included offense of attempted second degree robbery on count 7. The jury found true the firearm and gang allegations. Appellants admitted the prior conviction allegations. Mosley was sentenced to 33 years in state prison. Collins was sentenced to 45 years eight months in state prison.

Appellants raise several contentions of error relating to the firearm and gang enhancements, the prosecutor's conduct, and the admission of certain evidence. We affirm.

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     Count 5, kidnapping to commit another crime, was dismissed. Codefendant Phillip Ely (Ely), who is not a party to this appeal, was charged with the same five offenses as appellants, plus the offense of evading an officer against traffic (count 6), along with the gang allegations. The jury found him not guilty on all counts.

# FACTS

## Prosecution Case

### The Bank Robbery

On September 12, 2012, at about 10:00 a.m., three masked men entered a Bank of America in a shopping center in Canyon Country. The first two men to enter the bank jumped over the teller counter. The third man, who was identified as Mosley, stayed in the bank's lobby area. Bank customer David Urzua (Urzua) was in the bank's lobby and saw a gun in Mosley's right hand. Mosley pointed the gun around and told everyone to get down on the ground. Bank employee Valerie Rivas (Rivas), who was also in the lobby, saw Mosley walk around "as if he was holding something," and had something bulging in his waistband on the right side.

The two other robbers were holding bags and ran back and forth between the tellers. One of the robbers, who was wearing a construction reflecting vest, approached teller Erica Corona (Corona). Both Corona and assistant bank manager, Luis Urrego (Urrego), heard the robber tell Corona, "Give me all your fucking money or I'll fucking shoot you." Urrego saw "something" inside the robber's bag bulging out "in addition to the hand being under it." The "something" was "in the shape of a gun." Corona also saw "something" in the robber's hand inside a bag. The robber took money out of Corona's drawers and also grabbed a tracking device hidden in a strap of $20 bills. Urrego could see that both robbers had "something" in their bags besides their hands.

The second robber, who was wearing dark clothing, approached teller Brandon Ruffins (Ruffins). He grabbed Ruffins and pointed something "like a gun" covered in a black bag at Ruffins' face. Ruffins tried to head to the vault to activate the duress code, but the robber pulled him back to his station and told him to open the cash box. When Ruffins said he did not have the key to the cash box, the robber went over to teller Heather Gault (Gault). At that time, the first robber was shouting at Gault, "Give me the fucking money or I'll shoot you." Gault was frozen, so Urrego opened Gault's drawer and both robbers started taking out the money. When the second robber picked up a tracking device, he threw it back in the drawer.

Meanwhile, Mosley, who had stayed in the lobby area, took a cell phone from one of the bank's customers, Joyce Giger (Giger). All three robbers then fled together, taking $23,542.04 in cash with them. According to Urzua, the entire robbery took "two or three minutes at the most." Still photographs taken from the bank's surveillance videos were shown to the jury.

**The Getaway**

John Springer (Springer) was in the bank parking lot when he saw two men run out of the bank and jump into a black Honda. One man wore a construction vest and the other wore dark clothing, and one had on a mask. The man with the vest held a black bag in one hand and a black object in his other hand. As the Honda sped away, Springer followed in his car. He lost sight of the Honda for a couple of seconds, then saw it parked in an alley behind the shopping center with all the doors opened and no one inside. When Springer returned to the parking lot in front, he saw a black Volvo SUV (Volvo) leaving the lot and followed it on a hunch. At a red light, Springer looked over at the Volvo and saw Ely driving. Springer could not see into the back of the Volvo because the windows were tinted. Believing that the Volvo was involved in the robbery, Springer returned to the bank and reported what he had witnessed to law enforcement. Springer was inside the bank when Urzua told Springer that one of the robbery suspects had a gun.

Another witness saw several people exit the black Honda and run towards the Volvo. The witness flagged down a sheriff's deputy and gave him the license plate number of the Volvo. The deputy broadcast the vehicle information.

**The Pursuit**

Los Angeles County Deputy Sheriff Mark Manskar and his partner Sergeant Ronald Olfert eventually caught up to the Volvo travelling southbound on the 14 Freeway. The Volvo then headed eastbound on the 210 Freeway and stopped on the shoulder near the Yarnell off ramp. A Black man, who turned out to be Collins, exited the Volvo's front passenger's side door and ran down the embankment. The Volvo reentered the freeway at a high rate of speed. It continued eastbound, crossing all lanes

4

of traffic multiple times, then stopped again along the right shoulder near Hubbard Street. Another Black male exited the Volvo and ran down the embankment holding his waistband with his right hand. Sergeant Olfert believed the suspect was holding onto something, possibly a firearm.

The Volvo accelerated back onto the freeway, eventually turning onto the 110 Freeway towards Los Angeles. The Volvo exited on 2nd Street and travelled through downtown, making numerous traffic violations. As the Volvo travelled southbound on Vermont Avenue past Martin Luther King Jr. Boulevard, a large amount of money was thrown out of the Volvo's rear passenger's window. The Volvo circled a residential area surrounding Budlong Street to the west, 41st Street to the north, Figueroa Street to the east, and 53rd Street to the south 10 to 15 times or more. As more money was thrown out of the Volvo, crowds gathered screaming, "throw me the money." Articles of clothing, a large duffel bag, and other unidentified items were also thrown from the Volvo.

The Volvo was forced to stop by a large truck blocking traffic lanes. Ely was removed from the driver's seat, and Mosley was removed from the rear passenger's seat. A 47-minute video of the media coverage of the pursuit and the arrest was played for the jury.

Los Angeles County Deputy Sheriff Mark Cramer had participated in the freeway chase and both he and Sergeant Olfert identified Collins as the suspect they saw running from the Volvo at Yarnell. Collins was apprehended in the backyard of a house. When Collins was sitting in the back of the patrol car after his arrest, he said "I apologize for causing you guys all this trouble. I don't know why there's so many police here. It's not like we hurt anybody."[3] The robbery suspect who exited the Volvo after Collins was never caught.

---

[3] The trial court gave a limiting instruction that the statement was offered only against Collins and that the jury was not to consider the statement against his codefendants.

5

**The Investigation**

The black Honda was searched and processed for evidence. Items found in the car included two fluorescent construction vests, a five-gallon bucket lined with a trash bag in the back seat, a box of trash bags below the bucket, and two cell phones. The bucket had a small amount of water in it. There was also water on the floor and on the seat. One of the cell phones belonged to bank customer Giger and was returned to her. According to Detective Mark Lorenz of the Los Angeles County Sheriff's Department, who was assigned to investigate the robbery, experienced bank robbers fan through the money and discard any tracking device found, or submerge the money in a bucket of water to deactivate any tracking device.

The black Honda had been reported stolen from West 42nd Street, which is located in the territory of the Rollin' 40's gang. None of the items recovered in the Honda belonged to its owner, who did not know any of the defendants.

The Volvo was also searched and processed for evidence. Items found inside it included $298 in various denominations, money wrappers, water bottles, lighters, various pieces of clothing and shoes, and two pieces of black nylon "fashioned like a mask." The large duffel bag thrown from the Volvo also contained clothing, shoes and a black skull cap.

DNA analysis was conducted on 10 items collected in the case. The DNA profile of the black nylon was consistent with a mixture of at least two contributors, with Mosley being one of the possible contributors. The DNA profile of one of the shoes was consistent with a mixture of at least three contributors, with Collins being the major contributor.

Los Angeles County Sheriff's Detective Nicholas Gregary Cannis, who was also assigned to investigate the robbery and who had investigated "hundreds of bank robberies," opined that bank robbers hold their semiautomatic weapons inside of bags to capture any ejected shell casings when the weapon is fired so that law enforcement cannot collect them. He also opined that the surveillance video in this case showing the

6

men entering the bank dressed in layers of clothing was consistent with bank robbers who wear layers of clothing to "remove it after the robbery."

**Gang Evidence**

Los Angeles Police Department Officer Robert Smith testified as the prosecution's gang expert on the Rollin' 40's gang. In addition to his training and work experience in gangs, Officer Smith, who grew up in South Central Los Angeles, also had personal experience with gangs.

The territory of the Rollin' 40's gang consists of Figueroa Street to the east, Crenshaw Boulevard to the west, 52nd Street to the south, and Martin Luther King Jr. Boulevard to the north. Budlong is one of the streets within the gang's territory. Gang territories are marked by graffiti and gangs protect their territories by committing assaults and even murders of people who disrespect them by being in their territory. Having a territory is important to a gang because it permits the gang to sell drugs within the territory to make money. Having a "better" reputation is also important to a gang because it leads to more respect among other gangs. Being on the news for crimes committed is considered "good advertisement" for the gang and "helps with their reputation as an active gang." Gangs also enhance their reputation by putting up graffiti in a rival gang's territory and using social media to brag about their crimes. Instilling fear in the community is important to a gang because it allows the gang to commit crimes in their territory without people in the neighborhood reporting the crimes to police.

The Rollin' 40's gang has been around since the late 1960's or early 1970's. On September 12, 2012, there were approximately 1,000 to 1,200 members, and about 650 to 700 documented members. Gang members are documented when they admit their membership, have gang tattoos, associate with known gang members, or commit crimes with known gang members. Gang members are also documented from photographs taken with other gang members or where they are shown making gang hand signs. Common tattoos for Rollin' 40's gang members include the four-leaf clover, "F" for forties, "F" with the marlin from the Florida Marlins baseball team, "RFC" for Rollin' 40's Crip, and "XL," the roman numeral for 40.

The primary activities of the Rollin' 40's gang include murder, attempted murder, robbery, assaults, weapon-related crimes, criminal threats, and vandalism. Predicate offenses described by Officer Smith included Rollin' 40's gang members who were convicted of robbery with gang and firearm allegations, and attempted murder with gang, great bodily injury, and firearm allegations.

In early 2012, Officer Smith was driving down 43rd Street and observed appellants standing near each other. Recognizing Mosley from a prior contact, Officer Smith approached. When Officer Smith attempted to speak with Collins, Collins ignored him and left. After speaking with Mosley, Officer Smith returned to his car and was told by his partner that Collins was a documented Rollin' 40's gang member. Officer Smith also observed Collins's various Rollin' 40's tattoos at the preliminary hearing and reviewed Collins's field identification cards. Officer Smith opined that Collins was a Rollin' 40's member with the moniker "T.K." for "Tiny Klown."

Officer Smith opined that Mosley was a Rollin' 40's member based on his prior contact with Mosley, Mosley's admissions to other officers, Mosley's numerous Rollin' 40's tattoos, and Mosley's field identification cards. Mosley was also named in the gang injunction against the Rollin' 40's.

Officer Smith opined that Ely was an associate of the Rollin'40's. While there was no documentation regarding his membership and he did not have any Rollin' 40's tattoos, he was arrested for committing a crime with Rollin' 40's documented members.

A field identification card from 2007 indicated that appellants were together when they were contacted at that time. A photograph of appellants found on a cell phone showed them together on West 43rd Street, an area heavily populated by Rollin' 40's gang members. Another photograph found on a cell phone showed appellants with other Rollin' 40's gang members, and showed Mosley making a gang hand sign and Collins pointing to another man making a gang hand sign.

Given a hypothetical scenario based on the facts of this case, Officer Smith opined that the bank robbery was committed for the benefit of and in association with the Rollin' 40's gang. Rollin' 40's members committed the crime together and threw money in their

8

neighborhood "to gain favor amongst their fellow community members and gang members."  Officer Smith's opinion was based in part on two Twitter tweets, one from "Piranha" and the other from "Neisha."  Piranha's tweet said, "Free my Loc Tiny Hoodsta Foot."  It also said, "He couldn't keep the money, so he gave it to his hood" followed by "Real hood shit" and "Instagram."  According to Officer Smith, Tiny Hoodsta Foot is Mosley's moniker.  Neisha's tweet said, "Free my brother Hoodsta Foot. He did the most G'd bank robbery since set it off.  Laugh out loud.  The homie knew he couldn't."  The tweet was posted on Instagram and Twitter with a photograph of Mosley being taken into custody at the end of the pursuit and another photograph of Mosley making a Rollin' 40's hand sign.

### Collins's 2010 Bank Robbery

On March 5, 2010, at about 12:30 p.m., Jane Lee was working at United Commercial Bank in Rosemead when robbers entered the bank.  A Black man wearing a hoodie walked up to her, told her not to move and to put up her hands.  He appeared to have a gun in his pocket.  After the robbers finished, they ran out of the bank.  Still photographs taken from a videotape of the robbery were shown to the jury.

Collins and another man were eventually apprehended nearby hiding in a bush. They both had tattoos of a "4" and a "0" on their triceps, and Collins admitted being a Rollin' 40's member.  When Collins was searched, about $800 was found in his pocket.

Collins was subsequently charged with one count of robbery; there were no firearm or gang allegations.  The trial court here took judicial notice that Collins entered a no contest plea to second degree robbery on January 12, 2012, and that Collins was advised that such a plea would be treated the same as a guilty plea.

The parties stipulated that Collins has tattoos "including a four on one tricep and a zero on the other tricep, and that he had these tattoos on March 5, 2010."

**Defense Case**

**Collins's Evidence**

Collins played the videotape of the 2010 bank robbery.  The video showed the robbery from five views.

**Ely's Evidence**

Ely testified on his own behalf.  On September 12, 2012, he was 29 years old and living in Carson.  He was dressed in a shirt and tie with slacks and tennis shoes and was looking for a job.  Prior to September 12, 2012, Ely met "Timothy," also known as "Red," whom he had met through a close friend.  Red asked Ely if he wanted to make $50 to pick someone up about an hour away.  Ely agreed.  On the morning of September 12, 2012, Ely drove to 45th Street and Vermont Avenue to meet Red.  Ely parked his car and drove a Volvo provided by Red.  Red said Ely was to pick up Red's cousin in Santa Clarita.

At about 10:00 a.m., Ely pulled into a shopping center and waited for Red's cousin.  After about 10 minutes, a car pulled up next to him, and three people with a black bag hopped into the back seat of the Volvo.  One of the men was Mosley.  Ely was unaware of the robbery at the Bank of America.  Ely believed he was getting paid $50 as promised.  When one of the men asked another who Ely was, the man said, "Don't trip, he's just giving us a ride to L.A."

One of the men told Ely to get on the freeway.  When Ely stopped at a red light, he was told to drive through it.  Ely looked back, saw a bag full of money, and felt his life was in danger.  When police cars began following Ely, he attempted to pull over, but one of the men said, "Don't stop this motherfucker yet, I'm about to get out and run."  After passing a few more exits, the man told Ely to pull over, told another man to get out and gave him some money.  The man ran from the car and Ely was told to keep driving.  After a few more exits, another man told Ely to pull over and then ran out of the car.  During the pursuit, Ely committed a few traffic violations because he was told to, but he tried to drive as safely as possible.  One of the men grabbed Ely's cell phone and used it.  Mosley gave Ely directions.

10

While on the 110 Freeway, Mosley told Ely that he was going to throw the money out of the window. When Ely mentioned that news helicopters were out, Mosley replied, "Good," and said he was going to throw the money to create a crowd so that the police would not shoot him. Ely never saw a gun and no one ever threatened him.

Ely testified that he had never joined a gang and was not an associate of any gang. His friend Joseph's family lived in the neighborhood where the pursuit ended. Ely only visited the area about once a month or every two months. He testified that in his interview with Detective Cannis, he did not admit to being a getaway driver. He told Detective Cannis that he had met with Red and was going to make $50 by "picking some people up." Later in the interview, Ely said he was picking up one person. He also told the detective that he had seen the people who jumped in his car once or twice around "Vermont and 40s area." A recording of Ely's interview with Detective Cannis was played for the jury.

## DISCUSSION

### I. Firearm Enhancements

Appellants contend the evidence was insufficient to support the jury's true findings that a principal personally used a firearm. We disagree.

#### A. *Standard of Review and Relevant Law*

A defendant raising a claim that the evidence was insufficient to support a jury's verdict bears a "massive burden" because this court's "role on appeal is a limited one." (*People v. Akins* (1997) 56 Cal.App.4th 331, 336.) "'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; *People v. Hoang* (2006) 145 Cal.App.4th 264, 275.) We do not reweigh evidence, reappraise the credibility of witnesses, or resolve conflicts in the evidence, as these functions are

11

reserved for the trier of fact. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) This standard applies whether direct or circumstantial evidence is involved. (*People v. Thompson* (2010) 49 Cal.4th 79, 113.) It also applies to findings on enhancements. (*People v. Bryant* (2011) 191 Cal.App.4th 1457, 1472.) Reversal is not warranted unless it appears "'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Under section 12022.53, subdivisions (b) and (e)(1), any principal who "personally uses a firearm" during the commission of a qualifying felony is subject to additional punishment. "The firearm need not be operable or loaded for this enhancement to apply." (§ 12022.53, subd. (b).) A person "uses a firearm" "by intentionally displaying it in a menacing manner, firing it, or striking or hitting a human being with it." (*People v. Grandy* (2006) 144 Cal.App.4th 33, 42.) "[A] firearm is displayed when, by sensory perception, the victim is made aware of its presence." (*People v. Jacobs* (1987) 193 Cal.App.3d 375, 381.) "'Thus when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure. . . .' [Citations.]'" (*People v. Bryant*, *supra*, 191 Cal.App.4th at p. 1472.) "There is no requirement the victim actually see the gun." (*People v. Dominguez* (1995) 38 Cal.App.4th 410, 421.) "Circumstantial evidence alone is sufficient to support a finding that an object used by a robber was a firearm. [Citations.]" (*People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1436.)

### B. Analysis

Appellants argue the evidence was insufficient to sustain the firearm enhancements because it was based on the testimony of one witness out of 11 witnesses, and the testimony was inherently improbable. Appellants rely on *People v. Scott* (1978) 21 Cal.3d 284, 296, which states: "The uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable."

Appellants argue that Urzua's testimony that he saw Mosley holding a gun is inherently improbable because it is contradicted by the bank's surveillance video, which does not show Mosley pointing a gun at anyone. But it appears from the prosecutor's statement in her closing argument that the video was not clear enough to definitively contradict Urzua's testimony: "We do know that Mr. Urzua observed a gun on Mr. Mosley. You can't see the hands. It's very difficult, but you'll see it [the video]. You see Mr. Mosley's hands here, but you also see them go back behind his waist. It's up to you guys to determine." Later, the prosecutor stated, "So what we have here in this case is we don't actually see a gun." Appellants argue this statement is an admission by the prosecutor that the video does not show a gun. But it appears that the video was simply unclear, and that part of the time Mosley's hands were hidden. Indeed, appellants' counsel never argued that Urzua's testimony should be discounted because the video contradicted his testimony; rather, they argued that one witness's claim of seeing a gun was outnumbered by the claims of numerous other witnesses that they never saw a gun.

Moreover, Urzua's testimony that he saw a gun was in fact corroborated by Springer's testimony that Urzua told him at the bank that one of the robbery suspects had a gun.

Even apart from Urzua's testimony, there was ample evidence that the victims were aware of a gun's presence. Rivas saw Mosley walk around the lobby "as if he was holding something." The two robbers behind the teller counter said they had guns and repeatedly threatened to shoot. Urrego noticed that the robber wearing a vest held a black bag with "something that looked in the shape of a gun" bulging underneath the bag "in addition to the hand." Ruffins testified that the robber in dark clothing, who had his hand in a black bag, pointed something "like a gun" at Ruffins's face. And Detective Cannis, who has investigated "hundreds of bank robberies", opined that bank robbers held their semi-automatic weapons inside a bag to capture any ejected shell casings. Thus, a reasonable jury could infer that a principal used a firearm within the meaning of section 12022.53, subdivision (b).

13

**II. No Prosecutorial Misconduct Regarding Firearm Enhancement**

Mosley contends the prosecutor committed misconduct by misstating the law regarding the firearm enhancement during both voir dire and closing argument. Specifically, he argues "the prosecutor misstated the elements of the firearm enhancement by telling the jury that evidence the suspects had their hands in a bag, together with threatening comments during the robbery, was enough circumstantial evidence to prove a firearm was used in commission of the robbery. This evidence did not satisfy the elements of firearm use, which requires the victim have a 'sensory perception of a gun,' that is see it, feel it, or hear it."

**A. *Relevant Background***

During voir dire, the prosecutor explained the difference between direct and circumstantial evidence: "Someone who does testify, 'I see the man [come] up and he had a gun on him, pointed a gun,' that's direct evidence that that was a gun involved. The other side: someone comes up and their hands are covered, and the guy says, 'I'm going to shoot you.' That is circumstantial evidence that a gun was involved, because there was not a gun that was seen, but you can circumstantially take the idea of the fact his hands were covered and the comments used."

In her closing argument, the prosecutor stated: "So what I have to establish is that the victims were aware of the presence of a firearm through any sensory perception. In this case it's a combination of factors. They saw something. Luis Urrego said he saw something more than a hand in the bag that one of the suspects held. They had— Brandon Ruffins said they pointed it at him. There was something inside the bags and they—in combination with the comments that were made, don't make me use this, don't make me shoot you. And you can take it circumstantially to determine that there were firearms used against—were menacingly displayed against each of the victims."

In reviewing the bank surveillance photographs, the prosecutor stated that "it's really hard to see their hands, but you know there's something in them. And as you go through them, and you'll see it better close up on the laptop, it's just there's something in

14

them.  We can't really say for sure, but we know there's something in this hand.  This hand is gloved.  As they're leaving, they've got something in their hands."

Collins's counsel argued in closing that no gun was used because the one witness who said he saw a gun was contradicted by all the other witnesses who said they did not see a gun.  He stated that the prosecutor could prove the gun allegation if the jurors "want to rely on one guy who said he saw one" but argued "that should not be proof beyond a reasonable doubt."

The prosecutor argued in rebuttal:  "That's not what happened.  [The witnesses] didn't say that there wasn't a gun.  They may not have seen it, but they were aware of its presence.  They were made aware of its presence through comments, through actions, through the way that the defendants handled their hands and their body.  So there's circumstantial evidence that a gun was involved."

During deliberations, the jury submitted the following question:  "Does sensory perception mean that the people in the bank thought there was a gun."  After a discussion with the parties, the trial court instructed the jury in relevant part as follows:  "The People have the burden of proving the allegation that a principal personally used a firearm.  As part of this burden, the People must prove that a firearm was actually present.  [¶]  The term 'sensory perception' as included in the definition of the term 'displayed' refers to a human being's five senses:  seeing, hearing, touching, smelling and tasting.  [¶]  Read the entire Instruction [CALCRIM No.] 1402 along with this clarifying instruction."

### B. Analysis

"At closing argument a party is entitled both to discuss the evidence and to comment on reasonable inferences that may be drawn therefrom.  [Citations.]"  (*People v. Morales* (2001) 25 Cal.4th 34, 44.)  A prosecutor has "wide latitude" in this regard, and whether the inferences he or she "'draws are reasonable is for the jury to decide.' [Citation.]"  (*People v. Cole* (2004) 33 Cal.4th 1158, 1203.)

Mosley argues that the prosecutor committed misconduct by focusing the jury on the evidence that the suspects had their hands in a bag and their threatening comments.  According to Mosley, this constituted insufficient evidence to prove use of a firearm

15

because the prosecution was required to show the victims had a "sensory perception" of the gun.

We find no error by the prosecutor. First, Mosley's entire argument seems to forget that one of the witnesses testified that he *actually saw a gun* in Mosley's hand. Second, the jury was instructed with CALCRIM No. 1402 that "[a] firearm is displayed when . . . the person at whom the firearm is directed is made aware, through visual or other sensory perception, that a firearm is present." The trial court clarified to the jury that "sensory perception" referred to "seeing, hearing, touching, smelling and tasting." The prosecutor argued the evidence showed that Urrego and Ruffins *saw* that one robber held "something more than a hand in the bag" and Ruffins *saw* the robber point it at him. Additionally, both robbers claimed they were armed and repeatedly threatened to shoot. This constituted circumstantial evidence from which the jury could reasonably infer that the victims were "made aware, through visual or other sensory perception, that a firearm was present."

Contrary to Mosley's claim, the jury's question does not suggest their true finding on the firearm allegation was based on whether the victims "thought" a gun was present. This is so because the trial court told the jury that "sensory perception" referred to "seeing, hearing, touching, smelling and tasting."

In any event, appellant cannot show prejudice. The jury was instructed that statements by attorneys in closing arguments are not evidence. The jury was also instructed that facts may be proved by circumstantial evidence. The jury was instructed that a "firearm is *displayed* when, by a principal's intentional act, the person at whom the firearm is directed is made aware, through visual or other sensory perception, that a firearm is present." The jury was also instructed that "sensory perception" included "seeing, hearing, touching, smelling and tasting." Based on these instructions, evidence that the victims saw what was shaped like a gun inside bags held by the robbers, that one of the robbers pointed an item shaped like a gun at a teller, and that both robbers repeatedly claimed to have guns and threatened to shoot constituted circumstantial

16

evidence from which a jury could reasonably infer that a firearm was used during the commission of the robbery.

## III. Gang Enhancements

Appellants contend the gang enhancements must be reversed because there was insufficient evidence to support the primary activities of the Rollin' 40's gang and the finding that the robbery was committed for the benefit of or in association with the gang.

Under section 186.22, subdivision (b)(1)(C), a defendant who commits a felony for the benefit of, at the direction of, or in association with a criminal street gang is subject to additional punishment.

"To establish that a group is a criminal street gang within the meaning of the statute, the People must prove:  (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity.  [Citations.]"  (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457.)

"In order to prove the elements of the criminal street gang enhancement, the prosecution may, as in this case, present expert testimony on criminal street gangs."  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1047–1048.)

### A.  Primary Activities

"Primary activities" means "'one of the group's 'chief' or 'principal' occupations'" and more than a mere occasional occurrence.  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.)  Expert opinion is admissible to establish the primary activities of a criminal gang and may be based on the expert's testimony that he or she has personally investigated crimes committed by the gang's members, information obtained from gang members and victims, and information obtained from colleagues that the gang's primary activities constitute the commission of at least one of the offenses listed in subdivision (e) of section 186.22.  (*People v. Sengpadychith, supra,* at p. 324; *People v. Gardeley* (1996) 14 Cal.4th 605, 620.)

Appellants argue that Officer Smith's testimony regarding the primary activities of the Rollin' 40's was conclusory and failed to establish that the offenses were committed with sufficient frequency to constitute primary activities of the gang. We disagree.

In addition to having personally grown up with gang members and their culture, Officer Smith had been assigned to gang detail for four and a half years and had been specifically monitoring the Rollin' 40's gang for two years. He was "very familiar" with the Rollin' 40's members because he made contact with them daily and also received information about them from various agencies and people in the community. Officer Smith had testified about 30 to 35 times as an expert on gangs and about 20 times specifically as an expert on the Rollin' 40's gang. His qualifications as an expert on the Rollin' 40's gang provided a proper foundation for his testimony on the gang's activities.

Officer Smith testified as to predicate offenses by Rollin' 40's gang members that occurred in 2009 and 2010. One member was convicted of robbery with gang and firearm allegations and another was convicted of attempted murder with gang, great bodily injury, and firearm allegations. Officer Smith knew the defendant in the robbery case personally and learned about the defendant in the attempted murder case from his partner. He knew the monikers of the defendants and testified regarding the facts surrounding the crimes, which he learned from speaking with his partner. The acts of murder, attempted murder, robbery, attempted robbery, and assaults with a deadly weapon qualify as primary activities under section 186.22, subdivision (f). (§ 186.22, subds. (e)(1), (2) & (3).)

The jury was entitled to rely on Officer Smith's expert testimony when deciding the "primary activities" aspect of the gang enhancement. (*People v. Sengpadychith, supra*, 26 Cal.4th at p. 324 [gang expert's opinion testimony regarding gang's primary activities based on the expert's personal knowledge and investigations as well as information gathered from law enforcement agencies sufficient to prove gang's primary activities].) A qualified gang expert's testimony that a gang's primary activities include one or more of the statutorily enumerated offenses is sufficient to support the finding that the gang is a street gang. (See *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1330;

*In re Alexander L.* (2007) 149 Cal.App.4th 605, 611 ["Expert testimony based on an adequate factual foundation might also be sufficient" to prove gang's primary activities].)

Additionally, the robbery and attempted robbery committed here by appellants, who were both Rollin' 40's members, along with the evidence of Collins's bank robbery in 2010 with another Rollin' 40's member, "is also evidence of the gang's primary activity and is consistent with [the gang expert's] testimony." (*People v. Martinez, supra*, 158 Cal.App.4th at p. 1330; *People v. Sengpadychith*, *supra,* 26 Cal.4th at p. 323 ["Evidence of past or present conduct by gang members involving the commission of one or more of the statutorily enumerated crimes is relevant in determining the group's primary activities"].)

We are satisfied that substantial evidence supports the "primary activities" prong of the gang enhancement.

### B. Benefit or Association Prong

Appellants argue the evidence was insufficient to support the jury's finding that the robbery was committed for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of section 186.22, subdivision (b), because the evidence showed at most that the robbery was committed for the personal benefit of the perpetrators, and any other finding must be based on speculation. Again, we disagree.

The evidence showed that on September 12, 2012, appellants—who are members of the Rollin' 40's—arrived together at the Bank of America in Canyon Country in a Honda that had been stolen from the Rollin' 40's territory. They were wearing masks and were with another man. Once inside the bank, the three men coordinated their actions: Mosley kept everyone who was in the lobby in check, while Collins and a second man jumped the teller counter, threatened the tellers, and took money out of the cash drawers. The three men then fled the bank together, got into the stolen Honda, then got into the Volvo in which Ely was waiting for them. They then headed back to the Rollin' 40's territory in Los Angeles. Mosley began throwing money out of the Volvo's window as the vehicle circled an area within the gang's territory about 10 to 15 times.

19

Mosley kept throwing money and other items from the Volvo as large crowds gathered around them.

Additionally, Officer Smith opined that the robbery was committed for the benefit of and in association with the Rollin' 40's gang—the Rollin' 40's members committed the crime together and the stolen money was distributed in the gang's neighborhood to gain favor from the community and fellow gang members. An expert's opinion on an ultimate issue may be based on his expertise, "coupled with other evidence from which the jury could reasonably infer that the crime was gang related." (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 931.)

Appellants point out that they did nothing while robbing the bank to identify themselves as gang members. But as Urzua testified, the entire robbery lasted only two or three minutes. The robbers wore masks and were concentrated on the task at hand.

Mosley's additional argument—that events occurring after the robbery had been completed (discarding the money in the Rollin' 40's territory) should not be considered in determining whether the robbery was committed to benefit the gang—is without merit. Whether a crime benefits a gang is determined in part by assessing its effect, such as its impact on the community or among other gangs. (See *People v. Margarejo* (2008) 162 Cal.App.4th 102, 110 ["A community cowed by gang intimidation is less likely to report gang crimes and to assist in their prosecution. The gang benefit is plain"].)

Considering the expert testimony in conjunction with the evidence presented, the jury reasonably could have concluded that what happened here was more than merely a few people who happened to be gang members committing crimes as a group "on a frolic and detour unrelated to the gang." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.)

Once again, we are satisfied that substantial evidence supports the jury's finding that the robbery was committed for the benefit of or in association with the Rollin' 40's gang.

20

## IV. No Instructional or Prosecutorial Error Regarding Gang Enhancement

Mosley contends the trial court's instruction on the gang allegation (CALCRIM No. 1401) did not adequately instruct the jury on the element that the charged offenses were committed "for the benefit of, at the direction of, or in association with a criminal street gang." Specifically, he argues that the instruction failed to specify that the charged offense "must be 'gang related' and not merely committed in association with gang Members," and therefore the trial court had a sua sponte duty to define "in association with a criminal street gang." He also contends the prosecutor's misleading statements during closing argument regarding the application of the gang allegation as to Ely compounded the error.

Mosley has forfeited this challenge. "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024; *People v. Gonzalez* (2002) 99 Cal.App.4th 475, 483.) "If an instruction relates to 'particular facts to the elements of the offense charged,' it is a pinpoint instruction and the court does not have a sua sponte duty to instruct." (*People v. Middleton* (1997) 52 Cal.App.4th 19, 30.)

The parties did not object to CALCRIM No. 1401. Having failed to request further amplification of the phrase "in association with a criminal street gang," Mosley's claim is forfeited on appeal. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1348 [claim that an instruction correct in law should have been modified was forfeited for failure to request different language].)

In any event, the trial court had no sua sponte duty to further instruct the jury.

The jury was instructed with CALCRIM No. 1401 in relevant part as follows: "To prove this allegation, the People must prove that: [¶] 1. The defendant committed or attempted to commit the crime for the benefit of, at the direction of, or in association with a criminal street gang; [¶] AND [¶] 2. The defendant intended to assist, further, or promote criminal conduct by gang members." This language tracks the statutory language. (§ 186.22, subd. (b)(1).) As our Supreme Court has explained, "The language

of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification.  If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language." (*People v. Poggi* (1988) 45 Cal.3d 306, 327.)

Mosley has not demonstrated that "association," a common word, has a special definition in the street gang context.  "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning. [Citations.]  Thus, . . . terms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance. [Citation.]" (*People v. Estrada* (1995) 11 Cal.4th 568, 574–575.)  The jury was instructed, pursuant to CALCRIM No. 200, that words and phrases not otherwise defined were to be given their common and ordinary meaning.

Nor did the prosecutor err.  Mosley cites to the following argument by the prosecutor in closing argument:  "I don't have to prove that Mr. Ely is a gang member.  I just have to establish that he committed the crime in association with gang members, *for the benefit of the gang*.  And we have two gang members here, Mr. Mosley and Mr. Collins; and Mr. Ely commits a crime with them *to benefit the gang*, it's in association with.  And there's my gang allegation." (Italics added.)  The prosecutor made clear that the association had to benefit the gang.  Moreover, no one objected to the prosecutor's statements.  And the statements were directed as to Ely, whom the jury found not guilty on all counts.

## V.  Twitter Evidence

Mosley contends the trial court erred in admitting People's Exhibits 121 and 122, two Twitter tweets with comments about the robbery accompanied by his photographs. He asserts several reasons why the exhibits were inadmissible, including that they lacked proper foundation, were irrelevant, constituted late discovery and hearsay, and argues that their admission violated his constitutional rights to confrontation, due process, and a fair

trial. We do not address all of Mosley's arguments because we find that the exhibits were inadmissible due to lack of a proper foundation. But we nevertheless conclude that the error in admitting them was harmless.

### A. Relevant Background

On cross-examination, Collins's counsel asked the gang expert, Officer Smith, whether it was true that gang members yelled out their gang name when committing a violent crime for the gang's benefit so that the community would know who committed the crime. Officer Smith said it was not true. Counsel then asked about "occasions where gang members try to make it clear that they are committing a crime in the name of the gang." Officer Smith explained that gangs sometimes put up graffiti in a rival gang's territory or tag their gang name on the rival gang's wall, or commit certain crimes, such as assaults and robberies, to make themselves known. He added that gangs do not always let the community know that they committed the crime.

On redirect examination, the prosecutor asked whether gang members used "electronic media" to establish their credibility after committing crimes. Officer Smith stated that "some people would post things, admitting to doing different types of crimes." He explained that such postings related to gang members' use of graffiti or yelling out their gang name during a crime: "It enhances their reputation. You know, it's almost like advertisement, you know, just the same way as graffiti being put up on a wall to claim territory or to disrespect a rival gang. You know, it enhances, you know, that they're brave enough to go into rival territory and put something on the rival's wall. And then also on social media, to admit, you know, this is me who did it. It's almost like a braggadocious type of attitude."

Collins's counsel objected on relevance grounds stating, "there's none of this in this case." When the prosecutor stated there was some relevance, the trial court stated it would reserve its ruling. The prosecutor resumed the examination, asking Officer Smith whether he became aware of any Facebook postings after the robbery. He responded that he had seen "several postings."

Collins's counsel objected and asked for a sidebar. He argued the evidence was irrelevant because Collins, who was in custody, had nothing to do with the postings. Mosley's counsel joined. The prosecutor explained that she did not use the tweets during her direct examination of Officer Smith because appellants, who were in custody, could not have posted them. But since Collins's counsel had questioned how "they didn't yell out any gang names" during his cross-examination of Officer Smith, the prosecutor argued that the tweets gave "them the street credit that [Collins's counsel] was referring to."

After the trial court confirmed with the prosecutor that the evidence was being admitted to support Officer Smith's expert opinion about how the instant crime benefited the gang and not for its truth, Collins's counsel further objected and moved for a mistrial. Mosley's counsel joined. The court denied the mistrial motion and found the evidence admissible.

When redirect examination continued, Officer Smith testified that he had used two tweets from "Piranha" and "Neisha" as the basis for his expert opinion. He described and explained the content of the two tweets and the photographs of Mosley, two of which showed him being taken into custody. Officer Smith explained that he received the printouts of the tweets from Detective Cannis.

Later, outside the presence of the jury, Mosley's counsel moved for a mistrial on the grounds that the tweets were hearsay and lacked foundation. The trial court reserved its ruling. Collins's counsel also moved for a mistrial, adding that Officer Smith's testimony was "far more prejudicial" than when he had read the tweets and that he needed to cross-examine the persons who posted the tweets. The trial court found the tweets were not "so prejudicial" while the "probative value is evident."

Detective Cannis was cross-examined on the tweets by Mosley's counsel. He testified that he received the printouts of the two tweets from Detective Kolowski, who sat next to him and had been reviewing various social media for items related to the robbery shortly after it occurred. When Detective Kolowski found the tweets, Detective Cannis saw them on her computer screen and asked her to print them out. He placed the

printouts in his file. On recross-examination, Detective Cannis testified that the tweets were given to the prosecutor's office, along with a group of other photographs relating to the Rollin' 40's, sometime around the preliminary hearing.

Collins's counsel made another mistrial motion, arguing that he never received the tweets in discovery. Mosley's counsel joined. The prosecutor responded that she gave all copies of the gang photographs to the defense and that she did not intend to use the tweets until Collins's counsel cross-examined the expert about the lack of yelling out the gang name. Collins's counsel countered that his questioning did not open the door, and that his mistrial motion was based on the lack of discovery and the trial court's admitting the tweets into evidence. Appellants' counsel admitted that they had not conducted any investigation regarding the tweets since receiving them. The court agreed that the tweets were untimely and stated it would consider instructing the jury with CALCRIM No. 306. The court admitted People's Exhibits 121 and 122 into evidence over objections by the defense.

### B. Analysis

A writing, including photographs, must be authenticated before it may be admitted in evidence. (Evid. Code, §§ 250, 1401; *People v. Goldsmith* (2014) 59 Cal.4th 258, 266.) "Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law." (Evid. Code, § 1400.) A writing's proponent meets his burden of authentication "'when sufficient evidence has been produced to sustain a finding that the document is what it purports to be. [Citation.]'" (*People v. Valdez* (2011) 201 Cal.App.4th 1429, 1435.) There is no restriction on the means by which a writing may be authenticated. (*Ibid*.; Evid. Code, § 1410.)

We agree with Mosley that the twitter evidence was not authenticated. The person who found the evidence on the Internet, Detective Kolowski, did not testify. Thus, there was no evidence as to how she located the tweets. There was also insufficient proof of the source of the information in the tweets. No one identified who the alleged authors of

the tweets—Piranha and Neisha—were or whether they were members of the community, the Rollin' 40's gang, related to Mosley or people simply out to implicate him in criminal activity. There was no indication whether the tweets generated any reader responses. There was also no testimony, expert or otherwise, that the information pulled from the Internet was not a composite or faked. As stated in *People v. Beckley* (2010) 185 Cal.App.4th 509, 515–516, "'[a]nyone can put anything on the Internet. No web-site is monitored for accuracy and *nothing* contained therein is under oath or even subject to independent verification absent underlying documentation. Moreover, the Court holds no illusions that hackers can adulterate the content of *any* web-site from *any* location at *any* time.'"

We nevertheless find that the error in admitting the unauthenticated evidence was harmless under both the federal and state standards (*Chapman v. California* (1967) 386 U.S. 18; *People v. Watson* (1956) 46 Cal.2d 818, 836). Aside from the Twitter evidence, other testimony and evidence supporting the gang enhancement allegations was sufficient for the jury to find the allegations to be true. Officer Smith opined that the robbery was committed for the benefit of and in association with the Rollin' 40's gang because Rollin' 40's members committed the crime together and the stolen money was thrown in the gang's territory "to gain favor amongst their fellow community members and gang members." Other officers testified regarding the chaotic situation with cars stopped on the streets and "hundreds of people" running to where the pursuit had ended. One officer described it as "bedlam," with "people that live in the area coming out of their residences and from cars and begin running around." Another officer saw "literally hundreds of people running in the streets in their underwear, in their socks, no shirts on, in pajamas, I saw it all." A 47-minute video of the media coverage of the pursuit and the arrest was played for the jury.

Additionally, the trial court instructed the jury with CALCRIM No. 360: "Robert Smith testified that in reaching his conclusions as an expert witness, he considered statements made by others. I am referring only to the statements from other peace officers, members of the community, and information contained in written records and

26

reports.  You may consider those statements only to evaluate the expert's opinion.  Do not consider those statements as proof that the information contained in the statement is true."  The jury was also instructed with CALCRIM No. 332 on evaluating expert witness testimony, in part as follows:  "You must consider the opinions, but you are not required to accept them as true or correct.  The meaning and importance of any opinion are for you to decide . . . consider . . . the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion.  You must decide whether information on which the expert relied was true and accurate.  You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."  It is presumed the jury followed the instructions where there is no indication to the contrary.  (*People v. Gray* (2005) 37 Cal.4th 168, 217.)  Indeed, the jury's acquittal of Ely on all counts demonstrates that the jury followed the instructions and applied them to each defendant, rejecting Officer Smith's opinion as to Ely.

## VI.  Collins's 2010 Bank Robbery Evidence

Collins contends the trial court abused its discretion in admitting evidence of his 2010 bank robbery under Evidence Code section 1101, subdivision (b).  According to Collins, the prior robbery and the current robbery lacked similarity sufficient to prove intent, motive, or identity, and admission of the prior robbery was prejudicial under Evidence Code section 352.  He also contends the error violated his rights to a fair trial and due process.

### A.  Relevant Background

During a pretrial Evidence Code section 402 hearing, the prosecutor sought to introduce evidence of appellant's previous 2010 bank robbery conviction.  In that case, Collins had entered a bank with two other male suspects after a female suspect had initially entered to "case the joint."  Collins and the two males jumped over the handicap barrier, robbed the tellers and fled.  Over defense objection, the court allowed the evidence to show Collins's modus operandi, intent, and identity.  The trial court found the two events "to be very, very similar types of events, the current charges and the prior event in 2010.  So there's a substantial degree of probative value that I see."

27

The evidence presented to the jury showed that on March 5, 2010, United Commercial Bank in Rosemead was robbed by three men. One of the men was wearing a sweater with a hood. A shape in his pocket resembled a gun. A video of the robbery at United Commercial was played for the jury. The video showed one of the robbers jumping over a counter and hitting his head on a light.

After the robbery, Collins and another man matching the description of one of the robbers were detained. Both of them had tattoos of a four and a zero on their triceps. Collins admitted that he was a Rollin' 40's gang member. When he was searched, a roll of money was recovered. Collins pled no contest to the charge of robbery.

## B. Applicable Law

Under Evidence Code section 1101, subdivision (a), evidence of specific instances of a defendant's conduct is inadmissible to prove the defendant's conduct on a specified occasion. However, under Evidence Code section 1101, subdivision (b), evidence that a defendant "committed a crime, civil wrong, or other act" is admissible to prove some fact other than criminal disposition, for example, to prove motive. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 400 ["'Section 1101 does not prohibit the admission of evidence of misconduct when it is offered as evidence of some other fact in issue, such as motive, *common scheme or plan*, preparation, intent, knowledge, identity, or absence of mistake or accident'"].)

"There is an additional requirement for the admissibility of evidence of uncharged crimes: The probative value of the uncharged offense evidence must be substantial and must not be largely outweighed by the probability that its admission would create a serious danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Kipp* (1998) 18 Cal.4th 349, 371.)

Also, for evidence of prior uncharged crimes to be admissible, "there must be some degree of similarity between the charged crime and the other crime, but the degree of similarity depends on the purpose for which the evidence was presented." (*People v. Jones* (2011) 51 Cal.4th 346, 371.) The greatest degree of similarity is required to prove identity. (*People v. Jones* (2013) 57 Cal.4th 899, 930, citing *People v. Ewoldt, supra,* 7

28

Cal.4th at pp. 402–403.) "A somewhat lesser degree of similarity is required to show a common plan or scheme and still less similarity is required to show intent." (*People v. Jones, supra*, 57 Cal.4th at p. 930.) "'[T]he recurrence of a similar result . . . tends . . . to negative . . . [an] innocent mental state and tends to establish . . . the presence of the normal, . . . criminal intent . . . .'" (*People v. Ewoldt,* at p. 402.) We review a trial court's rulings under Evidence Code sections 1101 and 352 for abuse of discretion. (*People v. Jones, supra,* 57 Cal.4th at p. 930.)

### C. Analysis

Contrary to Collins's argument, we find that the 2010 bank robbery and the current robbery share features in common sufficient to support the inference that Collins committed the instant robbery, operated according to a common plan, and had the same intent to rob. In both robberies, banks were targeted, Collins and two other men entered the banks wearing masks, one man stayed in the lobby area while two men jumped over the teller counters and demanded money from the tellers, and the men fled the banks together.

We reject Collins's argument that the robberies are dissimilar because the prior robbery involved a woman who entered the bank first "to case the joint" and because the prosecutor did not allege a gang allegation in the prior robbery. The two crimes do not need to be identical. (*People v. Jones, supra*, 57 Cal.4th at p. 931 [to be "'highly distinctive'" for purposes of proving identity, "'the charged and uncharged crimes need not be mirror images of each other'"]; *People v. Carter* (2005) 36 Cal.4th 1114, 1149 [common features with charged conduct should indicate "'"a plan rather than a series of spontaneous acts, but the plan thus revealed need not be distinctive or unusual." [Citation.]'"].)

We agree with the trial court that the probative value of the 2010 bank robbery evidence was not substantially outweighed by the risk of unfair prejudice under Evidence Code section 352. There was nothing about the prior bank robbery that made it more inflammatory than the current bank robbery such that it would have created an emotional bias against Collins. The jury was instructed to consider the evidence solely for the

29

purpose of determining whether Collins committed the robbery in this case and whether he had a common plan or scheme to commit the robbery in this case. Because Collins had already been convicted of the 2010 bank robbery, the jury would not be "tempted to convict [him] of the charged offenses, regardless of his guilt, in order to assure that he would be punished for the uncharged offenses[.]" (*People v. Balcom* (1994) 7 Cal.4th 414, 427.) Accordingly, the trial court properly exercised its discretion in admitting the evidence.

Nevertheless, appellants argue that the prosecutor made matters worse by her closing argument. She began her argument as follows: "This is a straightforward case: robbery on September 12th, 2012, of the Bank of America with a pursuit and the arrest of the defendants. But wait a sec. This actually didn't start September 12th, 2012. This whole event started March 5th, 2010. [¶] On March 5th, 2010, Mr. Collins, who is presently here in court today over there next to his attorney, went into the United Commerce Bank with two other men. Ran inside the bank, robbed the tellers. He pled to this. [¶] This is another view of that. You guys saw this on the video. It's an exhibit, 108. [¶] During this robbery, one of the robbers actually hit his head on that lamp, as the teller was telling you, the money fluttering to the ground. Didn't get everything that they needed to, right? So he actually was charged with that offense and he pled to that offense. [¶] So he's now, after having admitted to the offense, he's back in his neighborhood. He meets up with Mr. Mosley, who is also here in court today, back in the Rollin' 40s. Those are the two defendants here in court. He has made mistakes in that first robbery that happened March 5th, 2010. So what does he do? He's going to do it and he's going to do it right."

The prosecutor then described the various planning and preparations that took place before the bank robbery in this case, and continued: "So there was a series of steps that were taken. Now, when Mr. Collins committed that first bank robbery and bumped his head and the money went everywhere—I'm going to make sure I have a bag next time. They got bags. So it shows that there's a series of steps that were taken. They thought about this."

30

The prosecutor's comments could arguably be understood to mean that she considered the current robbery to be a continuation of the prior robbery, a somewhat problematic proposition. But we are required to evaluate the comments in the context in which they were made, not in isolation. (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) Read in context, the prosecutor was merely highlighting that Collins planned the instant robbery so as not to make the same mistakes he had made before, such as not having a bag for the money. Contrary to Mosley's claim, there was evidence that the robbers in this case planned the robbery. They did not randomly enter a bank, demand money, and flee. They used a Honda stolen from the Rollin' 40's territory to arrive at the bank, they entered the bank wearing layers of clothing, masks and gloves, and they planned for a second car to make their getaway. They had bags to carry the money, to hide their guns, and to capture any ejected shell casings. They also had a five-gallon bucket lined with a trash liner, trash bags, and some water in the Honda, which were consistent with items needed to deactivate any tracking device in the stolen bank money. Further, the jury was instructed that nothing the attorneys say, including remarks in their closing arguments, is evidence.

Mosley points out that the trial court's written instruction to the jury regarding the prior robbery erroneously told the jury to consider the evidence of the prior bank robbery against Mosley and Ely. But this error was harmless. Right before the prosecutor presented the prior robbery evidence to the jury, the court correctly instructed the jury *not* to consider this evidence against Mosley or Ely. Moreover, because Mosley and Ely were not part of the prior robbery, the jury would not have drawn a connection between them and Collins's prior robbery. The jury was instructed that the prior robbery evidence was to be considered only for two purposes: whether Collins committed the robbery in this case and whether Collins had a plan to commit the robbery in this case. There is no reason why the jury would have used this evidence against Mosley or Ely. Indeed, it is clear that the jury carefully assessed the charges against each defendant individually, as evidenced by the fact that they found appellants not guilty of robbery on count 7 but

guilty of the lesser included offense of attempted second degree robbery, and acquitted Ely of all charges.

## DISPOSITION

The judgments are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, Acting P. J.
              ASHMANN-GERST


We concur:


_____, J.
       CHAVEZ


_____, J.
       HOFFSTADT